J-S43013-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: N.H., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.A., NATURAL MOTHER | : | No. 73 WDA 2017 |

Appeal from the Decree December 19, 2016
In the Court of Common Pleas of Allegheny County
Orphans' Court at No:  CP-02-AP-040-2016

BEFORE:   STABILE, SOLANO, and FITZGERALD[*], JJ.

MEMORANDUM BY STABILE, J.:                    **FILED SEPTEMBER 21, 2017**

S.A. ("Mother") appeals from the decree entered December 19, 2016, in the Court of Common Pleas of Allegheny County, which involuntarily terminated her parental rights to her minor daughter, N.H. ("Child"), born in December 2013.[1]  After careful review, we affirm.

The orphans' court summarized the factual and procedural history of this matter as follows.

> [The Allegheny County Office of Children, Youth and Families (OCYF)] originally became involved with the family in December of 2009 after receiving a referral alleging Mother was actively using drugs and that [Child's older siblings] were not being properly supervised.  That case was closed in April of 2010.  There were numerous other referrals made but all were

---

[*] Former Justice specially assigned to the Superior Court.

[1] The decree also terminated the parental rights of Child's father, A.H. ("Father").  The disposition of Father's appeal is by separate memorandum.

closed without further court intervention. OCYF received the most recent referral on September 20th, 2013, and the concerns were similar to the prior referrals. These concerns centered on the lack of supervision of the children, Mother's substance abuse, deplorable housing conditions, and domestic violence between the parents. Additionally, the oldest child had appeared at school with physical marks on his face. An OCYF caseworker met with Mother on September 25, 2013, at which time she admitted to actively using heroin and suffering from mental health issues. Additionally, Mother reported that she had recently filed a Protection From Abuse Petition (hereinafter PFA) against Father and that she had relapsed shortly thereafter. Mother and the children were listed as protected parties in the PFA Petition.

Shortly after Mother's admissions, an OCYF caseworker went to Father's home where he found Mother and the children despite the active PFA Petition. Mother refused to allow the caseworker into the home and eventually the local police had to assist OCYF in gaining entry into the home. Mother reported that she had spoken to Father and that he had advised her not to open the door. The house was observed to be in deplorable condition with no running water or working electricity. At that time, the caseworker created a safety plan for the family wherein Mother agreed to stay with a friend and refrain from allowing the children to have contact with Father.

Approximately one month later, Mother and the children were again discovered in Father's home. OC[YF] created another safety plan for the family [in] December [of] 2013. [Child] was born the following day . . . . The child was born at approximately 30 weeks, weighed 2 pounds and 6 ounces and tested positive for both cocaine and methadone. After the child's birth, Mother admitted to using heroin and crack cocaine three days prior. Furthermore, she admitted to using crack cocaine throughout her pregnancy. The City of Pittsburgh Police reported receiving a 911 call from Mother on February 2nd, 2014, reporting that Father had punched her in the face while at the hospital with [Child]. The responding officer observed swelling above Mother's eye and Father was charged with simple assault and was also charged with violating the PFA.

The child remained in the hospital until she was medically cleared to return home on February 5th, 2014. The child was

permitted to be released into Mother's care because In-Home Services through Holy Family were working with Mother in her home and addressing drug and alcohol treatment and parenting. However, OCYF made it clear that the child was to attend every scheduled medical appointment as she was considered a medically fragile child. Mother missed an appointment shortly thereafter and OCYF requested and was granted an Emergency Custody Authorization on February 19th, 2014. It was also reported to OCYF that Mother did not have stable housing and had been the victim of yet another domestic violence incident with Father. OCYF discovered that Mother withdrew the PFA Petition in March of 2014.

An Adjudicatory Hearing was held on April 1st, 2014 at which time both Father and Mother stipulated to Dependency. Mother stipulated that the child was born positive for both cocaine and methadone, that she was in need of drug and alcohol treatment, and that there was an active PFA Petition excluding contact between herself[,] the children[,] and Father. Father stipulated that he had criminal charges pending as a result of an alleged domestic violence incident with Mother and inadequate housing. . . .

Orphans' Court Opinion, 2/10/17, at 2-5 (footnotes omitted).

On March 2, 2016, OCYF filed a petition to involuntarily terminate Mother's parental rights to Child. The orphans' court conducted a termination hearing on July 22, 2016, and September 23, 2016. Following the hearing, on December 19, 2016, the court entered the decree complained of on appeal, in which it terminated Mother's parental rights. Mother timely filed a notice of appeal on January 10, 2017, along with a concise statement of errors complained of on appeal.

Mother now raises the following issue for our review. "Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that termination of [Mother's] parental rights would serve the

needs and welfare of the child pursuant to 23 Pa.C.S.[A.] §[]2511(b)?"

Mother's Brief at 5.

We consider Mother's issue mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the

emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b), which provides as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
> ***
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed

from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).

On appeal, Mother concedes that OCYF presented clear and convincing evidence that her parental rights should be terminated pursuant to Section 2511(a). Mother's Brief at 10 ("[O]CYF, the petitioner, did clearly and convincingly establish threshold grounds for termination pursuant to 23 Pa.C.S.[A.] §[]2511(a)(2)."). Thus, we need only consider whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). The requisite analysis is as follows.

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or

her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

In its opinion, the orphans' court found that OCYF presented overwhelming evidence in support of its petition to terminate Mother's parental rights. Orphans' Court Opinion, 2/10/17, at 15. The court explained that Child recognizes Mother and is minimally bonded to her, but that "it is both unrealistic and unhealthy to expect [Child] to wait in abeyance while the parents attempt to attain stability." *Id.* at 13. The court emphasized Mother's lack of stability, as well as Child's bond with her foster parents. *Id.* at 13-15.

In response, Mother argues that the orphans' court failed to consider the effect that terminating her parental rights would have on Child. Mother's Brief at 13. Mother further argues that the court conducted a "balancing and

fault-based analysis" of Section 2511(b), which focused improperly on her failings as a parent, rather than Child's needs and welfare. ***Id.***

After a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion. During the termination hearing, OCYF presented the testimony of psychologist, Terry O'Hara, Ph.D. Dr. O'Hara testified that he conducted several evaluations of Mother, which included individual evaluations, as well as interactional evaluations with Child. N.T., 9/23/16, at 29, 32, 51-53. Based on these evaluations, Dr. O'Hara opined that Mother is incapable of providing for Child's needs and welfare, due to her lack of stability, her parenting deficits, and her lack of attunement with Child. ***Id.*** at 52.

Concerning lack of stability, Dr. O'Hara testified that Mother suffers from opioid addiction with ongoing relapses. ***Id.*** at 32-33. When Dr. O'Hara evaluated Mother in April 2015, she reported relapsing three to five times during "the past year," by using heroin and cocaine. ***Id.*** at 33. When Dr. O'Hara evaluated Mother again in October 2015, she reported drinking beer and using cocaine during the previous month. ***Id.*** at 34. Finally, when Dr. O'Hara evaluated Mother in June 2016, she reported consuming "90 Neurontin tablets over three days" in March 2016, as well as "taking an unprescribed Benzodiazepine."[2] ***Id.*** at 34-35.

_____

[2] Mother also was charged with driving under the influence ("DUI"). OCYF presented the testimony of Officer Greg Early, of the Green Tree Police
*(Footnote Continued Next Page)*

Dr. O'Hara also expressed concern that Mother remains in contact with Father, despite numerous allegations of domestic violence. *Id.* at 40-41. Dr. O'Hara explained that he reviewed several PFA petitions and police reports, and that "[Mother] has alleged that [Father] had tackled her, grabbed her, slammed her head off concrete, punched her in the face with a closed fist, kicked her, grabbed her by her neck, strangled her, threw her to the ground. That these instances have been witnessed by the children." *Id.* at 39-40. Mother often recants her allegations of domestic violence, "and then seems to blame the county and externalize all responsibility for why persons are seeing domestic violence as a relevant issue here." *Id.* at 41.

Concerning Mother's relationship with Child, Dr. O'Hara testified that Mother did well during her initial interactional evaluation in August 2014. *Id.* at 52. "She showed affection, she interacted well with [Child]. She was calm and relaxed. She was . . . attentive, and I thought that [Child] interacted well with her mother as well." *Id.* However, Mother's most recent interactional evaluation, in February 2016, "was one of the most difficult interactionals I have observed in my approximately 15 years doing these evaluations." *Id.* at 51. He explained, "[Mother] cried for much of the interactional with [Child]. I thought that she may be under the influence of a substance as a result of her being very agitated and tangential." *Id.* at

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

Department, who testified that Mother was arrested and charged with DUI on March 4, 2016. N.T., 9/23/16, at 5-7.

51-52. Dr. O'Hara did not observe any evidence of an attachment between Mother and Child.[3] *Id.* at 79.

In addition, Dr. O'Hara testified that Child is thriving in the care of her foster parents, with whom she has lived for over thirty months. *Id.* at 83. Dr. O'Hara explained that he evaluated Child with her foster parents on three occasions. *Id.* at 50. "During her interactions with her foster parents [Child] is autonomous, euthymic, curious and frequently directs herself to her foster parents. They also, in my opinion, have excellent parenting skills as well." *Id.* at 49. Removing Child from the care of her foster parents would be "very psychologically detrimental for her." *Id.* at 83.

Ultimately, Dr. O'Hara opined that Child should be adopted by her foster parents. He summarized his conclusions as follows.

> [Child], in my opinion, due to her circumstances, she is in need of permanency. Permanency is the foundation of a lot of psychological developmental themes, including autonomy and independence and identity.

---

[3] Foster care home supervisor, Danielle Schmitt, provided a more positive description of Child's relationship with Mother.

> I think they have a nice relationship. [Child] does go to [Mother] at the beginning of visits typically. [Mother] is very understanding if [Child] has a difficult time when we first get to visits. If she hesitates a little bit, she usually gives her some space and let's [*sic*] her adjust to the surroundings and things like that. And then she will go to her. She is very loving towards [Child] during the visits.

N.T., 9/23/2016, at 95.

I've assessed [Child's foster parents] as possessing a significant amount of stability, strong parenting skills, and in my opinion [Child] has consistently exhibited security and attachments with her foster parents over time.

I don't have evidence that [Mother] has the stability necessary to care for a child at this time and I don't have evidence that she would be able to care for [Child's] physical or psychological needs. She is easily overwhelmed. She is clearly not stable, as evidenced by the DUI and the use of 90 Neurontin over three days, which could cause serious injuries to her, and also render her not able to specifically be present for her child. She continues to remain in close contact with [Father]. She shows very poor parenting skills with [Child]. If [Child] were to be placed with her mother at this time she would be at high risk for domestic violence, psychological instability, substance abuse and homeless.

So as a result of these factors and considerations, it's my opinion within a reasonable amount of psychological certainty that [Child] should be adopted by her foster parents, and the benefit of adoption would outweigh any potential detriment in termination of parental rights with regard to [Father] and [Mother].

*Id.* at 56-57.

Thus, the record confirms that terminating Mother's parental rights would best serve Child's needs and welfare. Mother is incapable of parenting Child safely, due to unresolved drug abuse and domestic violence concerns. In addition, it would be psychologically detrimental to remove Child from the care of her foster parents, with whom she has lived for nearly her entire life. While Child has a somewhat positive relationship with Mother, it was within the court's discretion to conclude that the benefits of permanency through adoption would outweigh whatever harm Child might experience if her relationship with Mother is ended. As this Court has stated, "a child's life

cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Before concluding our review, we note that Mother filed a reply brief in this Court on March 31, 2017, directing our attention to our Supreme Court's recent holding in *In Re Adoption of L.B.M.*, 2017 Pa. LEXIS 1150, 2017 WL 2257203 (Pa. 2017). In *L.B.M.*, the Court held that trial courts must appoint counsel to represent the legal interests of any child involved in a contested involuntarily termination proceeding pursuant to 23 Pa.C.S.A. § 2313(a).[4] The Court explained that a child's legal interests are distinct from his or her best interests, in that a child's legal interests are synonymous with the child's preferred outcome, while a child's best interests must be

_____

[4] Section 2313(a) provides as follows.

> **(a) Child.--**The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S.A. § 2313(a).

- 12 -

determined by the court. 2017 Pa. LEXIS 1150 at 2-3; 2017 WL 2257203 at 1.

In her reply brief, Mother contends that Child had a guardian *ad litem* ("GAL") during the termination proceedings, but not legal counsel, and that Section 2313(a) "is not satisfied by the appointment of the [GAL] even when that GAL is an attorney." Mother's Reply Brief at 1. Mother does not contend that this matter should be remanded for the appointment of separate counsel, but merely contends "that the record before this Court needs to be clear[.]" *Id.*

Mother is mistaken in her interpretation of *L.B.M.* This Court has explained that case's holding as follows.

> As a point of information, Justice Wecht's opinion in *L.B.M* states that the trial court is required to appoint a separate, independent attorney to represent a child's legal interests even when the child's GAL, who is appointed to represent the child's best interests, is an attorney. Justice Wecht would hold that the interests are distinct and require separate representation. While Justice Wecht, joined by Justices Donohue and Dougherty, sought to so hold, four members of the court, Chief Justice Saylor and Justices Baer, Todd, and Mundy disagreed in different concurring and dissenting opinions with that part of the lead opinion's holding. Specifically, while the other justices agreed that the appointment of counsel for the child is required in all TPR cases and that the failure to do so by the trial court is a structural error, they did not join that part of Justice Wecht's opinion which sought to hold that the GAL may never serve as counsel for the child. Rather, such separate representation would be required only if the child's best interests and legal interests were somehow in conflict. . . .

*In re D.L.B.*, 2017 Pa. Super. LEXIS 436 at 14-15, 2017 WL 2590893 at 5 (Pa. Super. 2017).

In this case, we discern no conflict between Child's best interests and legal interests. With respect to Child's best interests, GAL, Amy Berecek, Esquire, represented Child during the termination hearing, and GAL, Andrea Spurr, Esquire, represents Child on appeal. Attorney Berecek supported the termination of Mother's parental rights during the hearing, and Attorney Spurr supports termination in her brief to this Court. *See* N.T. 9/23/16, at 150-55; GAL's Brief.

With respect to Child's legal interests, our review of the record does not reveal that the GALs' position differed from Child's preferred outcome. Child was just over two and a half years old at the time of termination hearing, and it is clear that she was too young to provide any input on whether Mother's parental rights should be terminated. Moreover, the record confirms that Child has only a limited relationship with Mother. Child is attached to her foster parents, and removing Child from her foster parents would be "very psychologically detrimental for her." N.T., 9/23/16, at 56, 83. Thus, we conclude that Child's GALs represented both her best interests and legal interests, and that this dual role did not run afoul of *L.B.M.*

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating Mother's parental rights to Child involuntarily. We therefore affirm the court's December 19, 2016 decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  9/21/2017